

Myers & Galiardo, LLP | 52 Duane Street, 7Fl., New York, NY 10007 | 212-986-5900 | www.citylaw.nyc

BY ECF
The Honorable Katherine Polk Failla
Unites States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

April 26, 2023

Letter Memorandum in the Matter of:
Re: <u>United States v. Nickolas Sharp</u>
21 Cr. 00714 (KPF)

Your Honor:

On February 2, 2023 Mr. Sharp pleaded guilty to Counts 1, 3, and 4 of Indictment 21 CR 714. Count 1 charges the defendant with Computer Fraud, Count 3 with Wire Fraud, and Count 4 with Making False Statements to Law Enforcement under §3663A(a)(1) and (c)(1)(A)(ii).

**Discussion of Guideline Calculation and Sentencing Range:**

**The base offense level is 7 per §2B1.1(a)(1).** For reference, an individual in Criminal History Category I (Mr. Sharp) would face 0-6 months before enhancements or additional analysis.

We bring this fact to the Court's attention because the PSR has calculated a loss amount attributable to Mr. Sharp of more than 1.5 million dollars but less than 3.5 million, therefore, under **§2B1.1(b)(I)** a staggering **16-level enhancement applies**. It is noteworthy that Mr. Sharp received no monies as a result of his actions.

**U.S.S.G. §2B1.1(b)(10)(C)** applies because the offense involved a "sophisticated means" which enhances Mr. Sharp's guideline calculation by **two points**.

**U.S.S.G. §2B1.1(b)(19)(A)(ii)** applies because Mr. Sharp is convicted under 18 **U.S.C. 1030(a)(5)(A).** This section enhances Mr. Sharp's exposure an **additional 4-levels** under the guidelines.

Additionally, **U.S.S.G. §3B1.3** subjects Mr. Sharp to a **2-level enhancement** because he abused his position of private trust and used a special skill in a manner that facilitated the commission of the crime or concealment of the crime. Specifically, Mr. Sharp was responsible for cloud infrastructure security.

Lastly, **U.S.S.G. §3C1.1** applies to enhance the guideline calculation an **additional two levels** because Mr. Sharp impeded the investigation in the instant offense by disclaiming knowledge of his purchase of a Virtual Private Network product.

Because the Defendant qualifies for a **three-point reduction** for acceptance of responsibility and entering a timely plea under **U.S.S.G. §3E1.1(b)** his sentencing exposure for a total offense level of 30 is a staggering 97-121 months under the U.S. Guidelines. Additionally, Mr. Sharp must begin to pay restitution in the amount of $1,590,487 under **18 U.S.C. §3663A** which would, in essence, take a lifetime to pay.

**Personal and Family History**

Nickolas Sharp comes from an educated, close knit, religious family.

Mr. Sharp's father is a career nuclear engineer who presently consults for the Abu Dhabi Federal Authority for Nuclear Regulation. The defendant's mother made her career as a high school teacher. The family placed importance on education in Mr. Sharp's formative years.

Mr. Sharp was raised in the Mormon faith and follows Mormon teachings to this day, which includes abstinence from any drug or alcohol as well as participating in mission work and community service projects in countries of need. Mr. Sharp met his wife during one such mission trip in Argentina, South America.

Mr. Sharp has two brothers and one sister all of whom are educated and have children. Paragraph 77 of the PSR describes in detail the family and employment background of each sibling. We need not belabor the point that Mr. Sharp's entire extended family are educated, hardworking people who are well adjusted, and never had any run-ins with the law.

Mr. Sharp's formative years were very normal. Sharp is a vociferous reader which began at an early age. He was a disciplined child. He performed well in school.

He was a responsible young man which was reflected in his ability to achieve a position in scouting few achieve that being a Venture Scout (Silver) which is beyond Eagle Scout. Only 5% of the nation's scouts even become Eagle Scouts. He was a grounded individual in his formative years and attended youth group at his local church. As a result of his involvement with the Mormon Church from an early age he has followed the Church's practices to this day.

Mr. Sharp is married with 5 children. His wife has two grown children from a previous marriage. Valeria is the office manager for Prudential Cleanroom services in Hillsborough, Oregon. Mr. Sharp has a second step-daughter, Constanza, who recently joined the Air Force and is stationed at Minot, North Dakota. The three youngest children by blood are Marcus, age 13, Ember age 12, and Nickole, age 9.

Mr. Sharp shares in the responsibility of home schooling his children. He has complied with all state requirements for home schooling. He places a high degree of importance on educating his children. If Mr. Sharp were to be sentenced to a period of incarceration it would place his children in an awkward predicament concerning their schooling. Mr. Sharp's parents are in Abu Dhabi and his wife's parents are in Argentina.

**Education and Employment**

Mr. Sharp attended the University of Arizona for biochemistry. He did not complete his degree because of his family's missionary obligations in Argentina and his desire to discover the field of computer engineering. Shortly after working at a computer engineering firm he realized he had significant skill at writing computer code.

In 2013, Mr. Sharp took a job with his oldest brother's company, Jive Communications, based in Provo, Utah. He stayed for a year but his wife was unhappy with that location. Mr. Sharp found employment with Nike in 2014 which forced the family to relocate to Beaverton, Oregon. In 2017, Mr. Sharp moved on to Amazon Web Services based in Seattle, Washington. In 2020, he sought a higher paying job at Ubiquiti which compelled the family to move to Portland, Oregon.

After his arrest, Mr. Sharp continually applied for employment but was denied various opportunities after background checks were run. Mr. Sharp submitted scores and scores of applications.

Mr. Sharp's wife is gainfully employed at Lazarus Naturals earning roughly $40,000 annually. With three small children and a mortgage the family is suffering economically to make ends meet.

**Sentencing Factors 18 U.S.C. §3553(a):**

In the case of Nickolas Sharp, the factors to be considered under §3553 provide this Court with significant mitigation.

Pursuant to 18 U.S.C. §3553(a), by taking into consideration the defendant's strong family ties, his educational background, his lack of a criminal record entering this incident, the deterrent effect the conviction will place upon the defendant, as well as the staggering restitution mandated by the federal statutes, we ask the Court to consider a sentence far below the calculated guidelines.

There are various sentences available to the Court which avoid the need for an extended period of incarceration for a man who is 37-years-old and committed his first serious offense. In light of the fact that the Courts are concerned with making victims of crimes whole we ask the Court to consider the fact that Mr. Sharp will have a seemingly lifelong penalty of paying down the restitution amount of $1,590,487.

Mr. Sharp's case stands in stark contrast to the many violent recidivists who come through the courts. We urge this Court to consider Mr. Sharp's case as markedly different than that of a person with a long criminal history or that of a person who has committed an offense which had a clear victim. The Court should consider whether long-term incarceration is appropriate for a person who has never had any contact with the criminal justice system.

As a 37 year old, Mr. Sharp's age and background makes recidivism less likely. Defendants "over the age of forty ... exhibit markedly lower rates of recidivism in comparison to younger defendants." See *Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines*, at 12, 28 (2004). "Recidivism rates decline relatively consistently as age increases, 'from 35% under age 21 to 9.5% over the age of 50.'"

**Mr. Sharp's Family Support/Letters**

Mr. Sharp comes from a strong supportive family committed to helping him through this difficult time and will continue to support him upon his release from prison. He is instrumental in the life of all five of his children  He has, by all accounts, been an extraordinary father both emotionally and financially.
In summarizing the letters of support one can clearly understand that Mr. Sharp is a very supportive father and husband.

Daniel Sharp , the defendant's younger brother, wrote in his letter of support that Nick is "passionate, driven and creative. A good man and a loving father."

Cory Bowen, Mr. Sharp's brother-in-law wrote, " Nick is a good father, and loving husband, and an honorable individual."

Amanda and Chris Shinpaugh, neighbors of Nickolas Sharp, wrote "He's an exemplary family man who deeply cares for his loved ones. A role model to his children, teaching them values of hard work, honesty, and respect.  He is quick to offer his time and resources to those in need, without expecting anything in return."

Erin Sharp, the defendant's sister-in-law wrote, "Although Nick could definitely be described as blunt when talking with adults (he's not one to beat around the bush or shy away from opinion), he makes an extra effort to speak to all of the kids with a patient gentle tone and I've never had concerns about my children spending time with him."

Cynthia Alleman, who is a friend who connected with Mr. Sharp on several home remodeling projects wrote the following, "He needs to finish things in a precise manner.  Nick is constantly thinking about not just how to do something, but how to make it even better."

Joshua Sharp, Nick's brother, captures some of the qualities in Nickolas' personality that got him involved in this criminal matter.  Mr. Sharp was continually pointing out the many weaknesses in the security of Ubiquity's software.  Mr. Sharp brought to the attention of the CEO the fact that the passwords of many of the key security systems had not been rotated in years.  The cost of changing such major issues seem to override the company's ethical concerns. Mr. Sharp does not suffer fools lightly and the many letters of support describe a man who would rather get it right than have concerns for others'

feelings. This trait is described in many of the letters of support in unflattering terms.

Joshua Sharp wrote about his brother in the following manner:

"I've talked to Nick after he casually tore apart a manager of a firm for being a 'total idiot', and then, with just a few people, coded a solution over a long weekend that made the manager's entire team unnecessary…saving the company something like 10MM and two years of effort."

"I bring this up because his technical ability seems to have come at a cost. He's so obnoxious to the point I believe he has undiagnosed Asperger's. People under him seem to appreciate his taking care of them and help educate/fix code, but coworkers (including managers) Nick deems unproductive are more likely to deem him, and his obsession with doing the better job, a threat."

Again, it seems that Joshua's evaluation of Mr. Sharp is spot on and sheds light on why Mr. Sharp finds himself in this situation. His odd perspective in "teaching" the company's (Ubiquiti's) higher ups a lesson about their "less than secure systems" was unveiled in a most inappropriate manner. Drafting articles to Krebs about such insecure systems and attempting to extort the company in a halfhearted way so the company would finally pay attention to what he had pointed out on several occasions.

The defendant's father, Mark Sharp, wrote: " "I am proud of his ownership of the issue and his willingness to face the consequences." This is not the son I worked with though to become an Eagle Scout, who then went on to obtain the highest award in the Venturing scouting program, that of Silver. His missionary service while in Argentina was one of honor and saw him progress to being in charge of all Mission Housing and related billings and contracts during his last 6 months of service as a young man in his early 20's. He is a take charge kinda guy who is good with his hands as his mind."

Former coworker at Ubiquiti, Inc. Benjamin Scheiner wrote, "His technical expertise was unparalleled at Ubiquiti, especially in matters pertaining to security and cloud computing." Mr. Scheiner went on to glowingly describe Mr. Sharp as a kind and easy going boss as well as honest and well intentioned. He, like others, was stunned to learn of the allegations against Mr. Sharp. Again, a common thread in almost every letter describes Mr. Sharp's conduct as aberrational. Additionally,

6

most if not all of the letters describe his acumen for security and cloud computing to be extraordinary.

Peter Cowan, a co-worker at Ubiquiti wrote, "I had the opportunity to witness his exceptional skills and unwavering dedication towards his job, his coworkers, and his family." "His desire to use his knowledge for the principle of protecting the company and its customers from security threats, far exceeds what could reasonably be expected of an employee."

"With that in mind, when I read that he had pleaded guilty to these charges, I was utterly shocked and saddened. I still don't understand it, it's hard for me to believe it, and I struggle to make sense of it. Nick and I talked about ADHD when we work together. (Mr. Sharp takes the medications of Vivance and Dexedrine for ADHD as reflected in the PSR.) I deal with it myself, and I know what it is like to be in a state of monomaniacal focus on a task. That, combined with impulse control issues, stress, and sleep deprivation, must have led to some poor decisions in the moment that couldn't be undone. Perhaps because he cared so much about security, he broke some laws in order to bring attention to the serious issues that were not being address. Even doing wrong, he was attempting to do good. That doesn't make it right, but it does make it forgivable, and it does suggested leniency is in order."

"I believe that Nick's actions were out of character and that he is truly remorseful for what he has done. He has suffered a great deal already, and I do not believe that incarceration would serve any constructive purpose. He may never work in tech again, but he has many skills outside of tech, and I believe it would be best for Nick and his family to get him back to work to provide for them as soon as possible."

Brian Bradshaw wrote of how he worked with Mr. Sharp on three separate occasions in Utah (2013-2015), twice in Oregon (2015-2018) . "When I first met Nick during my interview in 2013, his straightforward candor was incredibly refreshing." "As I've worked with Nick on and off this past decade, his interactions have always been of radical candor about himself and others. "He was also honest about the areas we needed improvement. That has rubbed some people the wrong way, to be sure."  "He has lifted more people than I can count." (**Exhibit A**- Letters of Support)

Mr. Sharp's family continues to provide unparalleled support for him. He called all of his immediate family members to advise them of his conduct, a statement that reflects not only on his forthrightness, but also, shows his ability to understand the immorality of the situation. He completely understands his acts were illegal. It is yet another factor to be considered in determining whether or not Mr. Sharp is safe for our community.

The Guidelines fail to account for the strong family support that Mr. Sharp enjoys which will aid in his rehabilitation and reintegration into the community. Because the defendant's family and friends have not shunned him despite Mr. Sharp's full disclosure about his crime to them, he will likely not feel compelled to remain secretive if ever tempted to re-offend.

**Ruin of Reputation: Collateral Punishment**

Mr. Sharp's reputation has been demolished by this conviction. The felony conviction for computer fraud, wire fraud, and making false statements to law enforcement is a label that Mr. Sharp must endure for life. This alone may stand as a deterrent.

The ruin of a defendant's reputation can deter recidivism. In a securities fraud case when the guidelines called for a life sentence, the court imposed a 42-month sentence noting, "the ruin of reputation as a specific deterrent: 'with his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconducts.'" U.S. v. Adelson – F. Supp. 2d – 3006 WL 20087272 (S.D.N.Y. July 20, 2006). A securities fraud case is similar to the instant matter in that it is non-violent in nature. Mr. Sharp sought to harm no one. His public and personal reputation are ruined and therefore his likelihood of recidivism is low. The humiliation associated with his conviction is something Mr. Sharp, as a 37-year-old, must confront daily for the rest of his life.

**Mr. Sharp's Conduct is Atypical and Outside the Heartland of the Guidelines**

"The severity of the misconduct, it's timing, and the disruption it causes "are factors which influence a district court's determination of whether the misconduct in a particular instance makes the case atypical." U.S.S.G. ch.1. PT A comment 4 (b); Koon, 518 U.S. at 100 U.S. v. Parish, 308 F.3d 1025 (9th Cir. 2002).

8

## OTHER MITIGATING FACTORS

"District Judges need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." U.S. v. Gaskill, 991 F.2d 82, 86 (3rd Cir. 1993). The guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." U.S. v. Dominguez, 296 F.3d 192, 196 n.7 (3rd Cir. 2002). Remember also that "if the six hundred-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm." U.S. v. Blareck II, 7 F.Supp. 2d 192, 211 (E.D.N.Y. 1998).

### Clearly Aberrant behavior for this Defendant: Length of Time Until First Crime:

We ask the Court to recognize the length of time the Defendant refrained from the commission of his first crime, here until age 37. U.S. v. Ward, 814 F. Supp. 23 (E.D. Va. 1993). This case represents a marked deviation from Mr. Sharp's otherwise law-abiding life. U.S. v. Lavallee, 439 F.3d 670 (10th Cir. 2006).

In U.S. v. Hued, 338 F.Supp.2d 453 (S.D.N.Y. 2004), the defendant pleaded guilty to heroin possession and a downward departure of 11 levels was granted for aberrant conduct because the defendant was "never actively involved in the planning and conduct was of limited duration, and was a marked deviation from her law abiding life." In U.S. v. Booe, 252 F.Supp.2d 584 (E.D. Tenn. 2003), the defendant robbed a bank, but was granted a 9-level downward departure for aberrant conduct because of severe depression, lack of criminal record, little planning, and no violence. Noteworthy of the above mentioned cases is that in cases of *shotgun possession, heroin possession* and *bank robbery*, the defendants received little, if any, jail time.

## Conclusion

We respectfully ask this Court to sentence Mr. Sharp after considering the many factors under §3553(a) to a sentence far below the suggested guidelines. Mr. Sharp has no source of income following the termination of his employment. At the conclusion of his sentence, Mr. Sharp will have to completely resurrect his life and enter the workforce with a federal felony record. This fact alone will have a deterrent effect.

Under §5E 1.1 Mr. Sharp is mandated to pay restitution. Under 18 USC §3572 the defendant's income will be garnished to compensate the victim. In the interest of justice, and in light of the fact that Mr. Sharp is 37 years old, he will struggle to pay off the restitution for the rest of his life.

We ask that this Court to sentence Mr. Sharp to one year of home confinement so he is able to re-enter the workforce while working from home, support his family, and pay the mandatory restitution. That sentence appears to satisfy all of the sentencing goals of 18 U.S.C. §3553(a) while also taking into consideration the positive personal characteristics of Mr. Sharp.

Respectfully,

*Matthew Myers*

Matthew D. Myers
Attorney

Exhibit A- Letters of Support
Exhibit B- Defendant's Letter to Court